1

2

3

4

5          IN THE UNITED STATES DISTRICT COURT

6          FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    CLINTON REILLY,                              No. C 06-04332 SI

9           Plaintiff,                            **ORDER DENYING PLAINTIFF'S
                                                   APPLICATION FOR TEMPORARY
10      v.                                         RESTRAINING ORDER**

11   MEDIANEWS GROUP, INC., et al.,

12          Defendants.
     _____/

13

14

15

16          On July 27, 2006, the Court heard argument on plaintiff's application for a temporary restraining

17   order.  Having carefully considered the arguments of counsel and the papers submitted, and for good

18   cause appearing, the Court hereby DENIES plaintiff's application.

19          Plaintiff seeks an emergency order blocking the proposed sale of four San Francisco Bay Area

20   newspapers, claiming that the sale would result in the lessening of newspaper quality and choice for Bay

21   Area residents.  He filed this application a week before the billion-dollar sale was scheduled to close.

22   In that time, the Court has considered a substantial amount of evidence presented by both parties.  It

23   concludes that plaintiff has not established the urgent need for Court intervention that a temporary

24   restraining order requires.  While there is a need to examine the consequences of the proposed sale

25   further to ensure that no long-term harm will come to Bay Area residents, the transaction creates no

26   pressing and imminent danger to plaintiff or the public that would justify blocking the newspaper sales.

27

28

*United States District Court*

*For the Northern District of California*

**BACKGROUND**

This antitrust case concerns the ownership and control of daily newspapers in the greater San Francisco Bay Area, currently defined by the parties as encompassing San Francisco, Alameda, Contra Costa, Marin, San Mateo, Santa Clara, and Solano counties. By this action, plaintiff Clinton Reilly seeks to block a series of transactions through which, he claims, the three current owners of the major Bay Area newspapers are planning to consolidate ownership of those newspapers, to divide up the geographic markets, and ultimately to forego competing with each other. Because this case involves a large number of newspapers and national media companies, as well as a complicated series of transactions, the Court will first describe the parties.

Defendant The Hearst Company ("Hearst") is a New York company that owns and operates twelve daily newspapers, including its sole California newspaper, *The San Francisco Chronicle*. *The San Francisco Chronicle* is by far the largest newspaper in the Bay Area; according to its website, it has a daily circulation of over 512,000. *See* http://www.sfchron.com/about/index.php. The majority of this circulation – approximately 400,000 copies – is distributed outside San Francisco County. *See* McClatchy Oppo. Br. At 3 (stating that *The San Francisco Chronicle* has circulation of 114,000 copies inside San Francisco County).

Defendant MediaNews Group, Inc. ("MediaNews") is a privately owned company that owns and operates approximately forty daily newspapers in different areas of the country, including California. MediaNews holds a 54.23% interest in defendant California Newspapers Partnership ("CNP"), a partnership that owns and operates newspapers throughout California. CNP currently owns and operates eight major Bay-Area newspapers: *The Oakland Tribune* (and its *Alameda Times-Star* edition), which primarily serves northern Alameda County; *The Argus*, centered in the southern Alameda County city of Fremont; *The Daily Review*, circulated in Hayward and surrounding communities in central Alameda County; the *San Mateo County Times* in San Mateo County; the *Tri-Valley Herald* (and its *San Ramon Valley Herald* edition), which serves eastern Alameda County and southern Contra Costa County; the *Marin Independent Journal* in Marin County; the *Times-Herald*, based in Vallejo in southern Solano County; and the *Reporter*, which serves Vacaville and northeastern Solano county. *See* Wedgeworth Decl., Exh. 2 & ¶ 3. Altogether, these newspapers have a circulation of approximately 300,000 daily

United States District Court

For the Northern District of California

copies. *See* http://medianewsgroup.com/aboutus/circulationPrint.htm.

The other stakeholders in CNP are defendants Gannett Co. Inc. ("Gannett") and Stephens Group, Inc. ("Stephens"). Gannett publishes approximately ninety daily newspapers, including several California newspapers and *USA Today*. Stephens is a privately held investment banking firm located in Arkansas. It holds interest in a variety of businesses, including newspapers. Stephens owns a 26.28% share of CNP, and Gannett holds the remaining 19.49%.

Finally, defendant-intervenor The McClatchy Company ("McClatchy") is a newspaper publisher based in Sacramento, California. Until recently McClatchy owned and operated 12 daily and 17 non-daily newspapers, including *The Sacramento Bee*, *The Fresno Bee*, *The Modesto Bee*, and the Minneapolis-based *Star-Tribune*. While not named as a defendant in Reilly's complaint, it is McClatchy's proposed sale of four newspapers to MediaNews and Hearst that is the genesis of this lawsuit.

On March 13, 2006, McClatchy issued a press release announcing that it had entered into a definitive agreement to acquire Knight Ridder, Inc. ("KRI"), a major national newspaper publisher. Through the transaction, McClatchy would gain control of KRI's 32 daily newspapers and 50 non-dailies, making McClatchy the second-largest newspaper company in the country. The transaction closed on June 27, 2006. Through the acquisition, McClatchy's presence in California was expanded by two Bay Area newspapers: the *Contra Costa Times*, a paper with four daily editions based in Contra Costa County, which has a total daily circulation of 183,000; and the *San Jose Mercury News*, a newspaper based in Santa Clara County with a daily circulation of 276,000. *See* http://www.contracostatimes.com/ mld/cctimes/contact_us/about/; http://www.mercurynews.com/mld/mercurynews/contact_us/about/; McClatchy also acquired the *Monterey Herald* and the St. Paul *Pioneer Press* in the transaction.

The transaction valued KRI at approximately $6.5 billion; McClatchy borrowed approximately $3.08 billion to finance the acquisition and pay related transaction costs. Talamantes Decl., ¶ 4. To reduce this debt, McClatchy planned to sell twelve of the KRI newspapers. Given that McClatchy owned the Minneapolis *Star Tribune*, the *Pioneer Press* was an instant candidate; the Justice Department

United States District Court

For the Northern District of California

3

would not allow McClatchy to operate both newspapers.[1]  McClatchy also decided to sell the other three newspapers mentioned above.  All told, the sale of the twelve KRI newspapers will generate approximately $2 billion in revenue.[2]

On April 26, 2006, McClatchy and defendants Hearst and MediaNews announced a series of transactions through which McClatchy would divest itself of the four newspapers named above. Although the transactions are complicated, the end result is fairly simple: MediaNews will eventually acquire all four newspapers.  In the proposed transactions, McClatchy would directly sell the *San Jose Mercury News* and the *Contra Costa Times* to MediaNews for $736.8 million.  McClatchy would also sell the *Monterey Herald* and *Pioneer Press* to Hearst for $263.2 million.  In addition to the above agreements, Hearst and MediaNews negotiated a separate agreement in which Hearst would transfer the papers it acquired to MediaNews; MediaNews would operate those papers until the terms of the transfer were finalized.  In the preferred method of transfer, Hearst would acquire an interest in MediaNews in exchange for the transfer, specifically an equity investment in MediaNews' operations that did not include any economic interest or governance rights in MediaNews' Bay Area publications.[3]  Because Hearst's investment in MediaNews would be subject to scrutiny by the Justice Department, however, the companies did not finalize the exact parameters of the investment.  As an alternative method of transfer, in case Hearst and MediaNews were unable to agree on the terms of the investment, MediaNews agreed to purchase the newspapers directly from Hearst.  Thus, regardless of whether Hearst is able to invest in MediaNews, the effect of the April 26, 2006, agreements is that all four McClatchy papers will eventually end up in MediaNews' hands.  Finally, because these transactions were all

---

[1]On June 27, 2006, the Justice Department filed a complaint in the District of Columbia seeking to block McClatchy's acquisition of KRI.  At the same time, the Justice Department filed a proposed consent decree allowing the transaction to proceed provided McClatchy divested itself of the *Pioneer Press*.

[2]McClatchy represents that six of the other eight newspapers have already been sold, generating proceeds of approximately $770.6 million, and that the remaining two are scheduled to be sold on July 28, 2006, for approximately $230 million.  Talamantes Decl., ¶ 6.

[3]Although Hearst's proposed interest in MediaNews does not include MediaNews' Bay Area publications, Hearst implies in its filings that it will seek permission at a future time to convert its interest in MediaNews into MediaNews common stock.

4

**United States District Court**

**For the Northern District of California**

1   interrelated, the McClatchy sales transactions were conditioned upon each other. That is, both Hearst's

2   and MediaNews' acquisition of the McClatchy papers must be completed at the same time or not at all.

3       Once MediaNews acquired the *Contra Costa Times* and the *San Jose Mercury News*, the papers

4   would be transferred to CNP, with both Stephens and Gannett contributing their proportionate share to

5   the purchase price of the two newspapers. In addition, once MediaNews acquired the *Monterey Herald*,

6   that paper would be owned and operated by a newly formed partnership owned 67.36% by MediaNews

7   and 32.64% by Stephens. Again, Stephens would contribute its share of the purchase price of the

8   *Monterey Herald.*

9       On July 14, 2006, plaintiff Clinton Reilly filed this suit, seeking to enjoin the defendants from

10  consummating these transactions. According to plaintiff, if the transactions are completed, it "will result

11  in the defendants' control of every major newspaper in the Greater Bay Area." Compl. at ¶ 23.

12  Specifically, if the transactions are allowed to go through, it appears that every major Bay Area

13  newspaper will be owned and operated by CNP, with the sole exception of *The San Francisco*

14  *Chronicle. Compare* Compl. at ¶ 22 (listing major Bay Area newspapers by county), *with* Wedgeworth

15  Decl., Exh. 2 (listing CNP-owned newspapers).

16      Reilly contends that these agreements are part of a larger conspiracy between The Hearst

17  Company, MediaNews, CNP, Gannett, and Stephens to divide the Bay Area into discrete regions, each

18  of which is covered by a single newspaper monopoly. Further, Reilly contends that once the Bay Area

19  has been divided in this manner, the parties will honor a preexisting agreement not to compete with each

20  other. He alleges that this conspiracy and its underlying transactions violate three antitrust laws: Section

21  7 of the Clayton Act, 15 U.S.C. § 18; Section 1 of the Sherman Act, 15 U.S.C. § 1; and Section 2 of the

22  Sherman Act, 15 U.S.C. § 2.

23      Reilly filed the instant application for a temporary restraining order on July 24, 2006. The parties

24  stipulated to a briefing schedule and appeared before Court on July 27, 2006. Having considered the

25  parties' arguments, the Court DENIES plaintiff's application.

26

27                                   **LEGAL STANDARD**

28      Temporary restraining orders are governed by the same standard applicable to preliminary

5

**United States District Court**

For the Northern District of California

1    injunctions. *See Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs., Inc.*, 181 F. Supp. 2d 1111,

2    1126 (E.D. Cal. 2001) ("The standard for issuing a preliminary injunction is the same as the standard

3    for issuing a temporary restraining order."). A plaintiff can demonstrate it is entitled to such preliminary

4    relief in either of two ways. Under the "traditional criteria," a plaintiff must show: "(1) a strong

5    likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary

6    relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public

7    interest (in certain cases)." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1158 (9th Cir. 2006).

8    Alternatively, a plaintiff may establish "*either* a combination of probable success on the merits and the

9    possibility of irreparable harm *or* that serious questions are raised and the balance of hardships tips

10   sharply in his favor." *Id.* (emphasis in original). These two formulations of the alternate test "represent

11   two points on a sliding scale in which the required degree of irreparable harm increases as the probability

12   of success decreases." *LGS Architects, Inc. v. Concordia Homes of Nev.*, 434 F.3d 1150, 1155 (9th Cir.

13   2006).

14

15                                        **DISCUSSION**

16        In evaluating plaintiff's application for a temporary restraining order, the Court must first define

17   the precise conduct at issue. Plaintiff attempts to cast this lawsuit as an attempt to stop an overarching

18   conspiracy to monopolize the Bay Area's newspaper markets. Thus, he argues, the Court must consider

19   not only the effect the sale of the four McClatchy newspapers will have on competition, but also the

20   effect of Hearst's planned investment in MediaNews and the alleged anticompetitive intentions of the

21   defendants. The only evidence of this conspiracy that plaintiff offers, however, is the interconnectedness

22   of the sales agreements. Why, plaintiff asks, would Hearst be willing to help finance an acquisition that

23   will only make its competitor stronger unless Hearst expects a later *quid pro quo*?

24        Defendants, for their part, do not attempt to explain the motivations behind Hearst's actions.

25   Instead, they argue that the only transactions properly before the Court are the two sales transactions for

26   the four McClatchy newspapers. According to defendants, Hearst's potential investment in MediaNews

27   is not properly before the Court at this time because it is not yet structured, and, more importantly, must

28   first be approved by the Justice Department. Finally, defendants argue that because all the contested

**United States District Court**

For the Northern District of California

1  transactions are in the open and have been fully disclosed, the effects that future transactions will have

2  on competition can be considered as those transactions near their execution points.

3      The Court agrees with the defendants on this issue. Hearst's investment in MediaNews is far too

4  preliminary to be considered in the antitrust analysis. A number of events could occur that would

5  prevent the transaction from ever taking place; foremost among them is the possibility that the Justice

6  Department will impose conditions on the investment that are too onerous for either Hearst or

7  MediaNews to accept. Given that the structure of the investment is wholly unknown, the Court believes

8  that the investment is too speculative to be considered in the instant analysis.

9      Nor does the Court accept Reilly's argument that the Court must consider defendants' actions

10  as a whole because they are part of a single overarching conspiracy. If Reilly had proof that such a

11  conspiracy existed, the Court's analysis would obviously be different. With nothing but "Occam's

12  Razor" to support his conspiracy allegations, however, *see* Def. Reply Br. at 6 n.3, plaintiff's allegations

13  are too speculative to support the temporary restraining order plaintiff seeks.

14      While Reilly cites a number of cases in support of the proposition that actions in furtherance of

15  a conspiracy should be considered as a whole, the cases he relies on are distinguishable. The most

16  obvious difference between this case and the cases Reilly cites is that none of those cases involved the

17  preliminary relief Reilly seeks here. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370

18  U.S. 690 (1962) (antitrust action for damages for collusion in vanadium industry); *Beltz Travel Serv. v.*

19  *Int'l Air Transport Ass'n*, 620 F.2d 1360 (9th Cir. 1980) (claim that airlines and airline associations had

20  conspired to eliminate independent travel tour operators); *Sanitary Milk Producers v. Bergjans Farm*

21  *Dairy, Inc.*, 368 F.2d 679 (8th Cir. 1966) (claim that milk cooperative had engaged in conspiracy to fix

22  wholesale prices of milk). Rather, the cases all involved conspiracies that occurred in the past, allowing

23  the plaintiffs ample time to investigate and prove their allegations. Here, Reilly seeks to use a temporary

24  restraining order to allow him to investigate and challenge defendants' future actions. This is not a

25  proper use of such extraordinary relief. *See, e.g.*, *Earth Island Inst.*, 442 F.3d at 1158 (to obtain a

26  preliminary injunction, *plaintiff must demonstrate* combination of success on the merits and irreparable

27  harm).

28      By contrast, this case does not involve allegations that a covert antitrust conspiracy existed at a

**United States District Court**

For the Northern District of California

1  prior point in time. Rather, Reilly seeks only prospective relief, attempting to block transactions that

2  are not only in the future, but fully disclosed to the public. In such a circumstance, the Court cannot see

3  any harm in considering the antitrust implications of each step in a series of discrete transactions.

4  Accordingly, the Court finds it proper to evaluate the transactions as they unfold, rather than evaluating

5  the end result once all steps have been completed.

6  In evaluating Reilly's application for a temporary restraining order, the Court will therefore only

7  consider the two transactions that are imminently set to close: (1) the Hearst acquisition of the *Monterey*

8  *Herald* and *Pioneer Press*; and (2) the MediaNews acquisition of the *San Jose Mercury News* and the

9  *Contra Costa Times*. As future transactions ripen Reilly may bring other requests for injunctive relief

10  before the Court.

11

12

13  **I.    Hearst Transaction**

14  One of the above transactions is easily disposed of. The sale of the *Monterey Herald* and the St.

15  Paul *Pioneer Press* to Hearst does not raise any independent antitrust concerns. Indeed, even plaintiff

16  does not argue that either the *Pioneer Press* or the *Monterey Herald* fall within the relevant geographical

17  market. *See, e.g.*, Compl. at ¶ 22 (listing newspapers and Bay Area counties at issue) Thus, Hearst's

18  acquisition of these papers, and their subsequent transfer to MediaNews, are not relevant to plaintiff's

19  antitrust charges.

20  Plaintiff faces no irreparable injury from the sale of either the *Monterey Herald* or the *Pioneer*

21  *Press*, nor is plaintiff likely to succeed on the merits of his antitrust claim with respect to these two

22  papers. Thus, the Court DENIES plaintiff's request that it enjoin the Hearst transaction.

23

24  **II.    MediaNews Transaction**

25  The more difficult question before the Court is whether the sale of the *San Jose Mercury News*

26  and the *Contra Costa Times* raises any antitrust concerns. As discussed above, plaintiff must show some

27  combination of irreparable injury and likelihood of success on the merits to succeed in his application

28  for a temporary restraining order. *Earth Island Inst.*, 442 F.3d at 1158 .

8

**United States District Court**

**For the Northern District of California**

### A.    Irreparable Harm

Plaintiff's claims of irreparable harm are the most problematic portion of his temporary restraining order application. Reilly claims three ways in which he will suffer irreparable harm from the MediaNews transaction. First, he contends that his newspaper subscription rates will increase. Second, and relatedly, he contends that newspaper advertising rates will increase. Finally, plaintiff asserts that he will be injured as a consumer of newspapers because newspaper quality will decrease due to the lack of competition. The Court finds that none of these is sufficient to constitute true irreparable harm.

Plaintiff's first two allegations of injury are insufficient to justify a finding of irreparable harm. Both allegations assert ways in which plaintiff will be financially injured. It is well established, however, that an injury that is solely financial and that is compensable by monetary damages cannot constitute irreparable injury. *See, e.g.*, *American Tunaboat Ass'n v. Brown*, 67 F.3d 1404, 1411 (9th Cir. 1995) (finding that the loss of a week's worth of revenue "falls far short of qualifying as irreparable injury" because "[i]njury of a strictly monetary nature generally is not cognizable as a basis for issuing an injunction").

The third form of irreparable harm that Reilly identifies is more complicated. Plaintiff, in effect, argues that the MediaNews transaction will harm competition, which in turn will harm consumers throughout the Bay Area. Specifically, Reilly contends that the consolidation of Bay Area newspaper ownership will "deprive newspaper subscribers and readers, including plaintiff, of access to news, editorial, entertainment, and advertising content that would otherwise be available." Compl. at ¶ 24. Assuming, for purposes of plaintiff's motion, that he has standing to raise such an injury to competition,[4] the Court finds that such an injury is insufficient to constitute irreparable harm in this instance.

The Ninth Circuit has acknowledged that in some instances "injury to competition" might be sufficient to form the basis for a claim of irreparable injury. *See Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (theorizing that "[a] sufficient showing of injury to competition could support a finding of irreparable harm" where company alleged that its competitor's

---

[4]In Reilly's previous antitrust challenge to Bay Area newspaper consolidation, the court found that Reilly had a legally cognizable interest in competition. *Reilly v. The Hearst Corp.*, 107 F. Supp. 2d 1192, 1195 (N.D. Cal. 2000). In their briefs, defendants do not challenge plaintiff's standing.

United States District Court

For the Northern District of California

illegal acts were preventing it from competing in marketplace). Further, this district has previously found that a consumer of newspapers has a legally cognizable interest in competition among those newspapers. *Reilly v. The Hearst Corp.*, 107 F. Supp. 2d 1192, 1195 (N.D. Cal. 2000) ("[A]s a consumer of newspaper news, features, and opinions, he is entitled to attempt to prove that the challenged transactions cause injury to competition for readers among economically viable newspapers."). Here, however, Reilly cannot demonstrate that any "injury to competition" bears the immediacy and permanence necessary for a finding of irreparable injury.

As an initial matter, there will undoubtedly continue to be other sources that continue to provide consumers with "news, editorial, entertainment, and advertising content," such as the television, radio, and the Internet. While the Court reserves for another day the determination whether those sources occupy the same market as newspapers, they nonetheless provide services that overlap with the services Reilly complains he will be deprived of. In addition, *The San Francisco Chronicle* will continue to exist. With a level of circulation outside San Francisco County that rivals all the other major Bay Area newspapers combined, *The San Francisco Chronicle* is a strong source of competition for CNP's newspapers, even after the MediaNews acquisition is finalized. Finally, even assuming that competition will be harmed by the merger, the effects are unlikely to be felt for a substantial period of time. Reilly's claimed injury is therefore not truly imminent.

Setting aside the immediacy of Reilly's injury, the MediaNews transaction is also not as permanent as Reilly makes it out to be. Reilly contends that it will be impossible to reverse the transaction "once the eggs are scrambled," and that lost competition will not be replaceable because of the high barriers to entry in the newspaper industry. Unlike many business mergers in which the absorbed company ceases to exist, however, the *San Jose Mercury News* and the *Contra Costa Times* will continue to exist following the transaction. Thus, should Reilly ultimately prove successful in this action divestiture of the newspapers at issue remains an option. *Cf. United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961) (describing divestiture as "that most drastic, but most effective, of antitrust remedies"). While divestiture is not a remedy to be lightly imposed, the Court emphasized to defendants at oral arguments that divestiture was a remedy it would seriously consider if the MediaNews transaction proves to be anticompetitive. All of the defendants acknowledged the

10

1   possibility of divestiture.

2       The Court therefore finds that the threatened injury to plaintiff on account of the MediaNews

3   transaction is not immediate or permanent enough to constitute true irreparable injury.

4

5       **B.    Likelihood of Success on the Merits**

6       Given that plaintiff cannot demonstrate true irreparable injury, he must make a heightened

7   showing of likelihood of success on the merits in order to prevail.  While Reilly has raised serious

8   questions about the MediaNews transaction, he has not made a sufficiently strong showing to meet his

9   burden.

10      The starting point for analyzing an antitrust claim is defining the relevant market.  A relevant

11  market consists of two components: a product market and a geographic market.  *See, e.g.*, *United States*

12  *v. Mercy Health Servs.*, 107 F.3d 632, 634 n.3 (8th Cir. 1997); *see also Lucas Auto. Eng'g, Inc. v.*

13  *Bridgestone/Firestone, Inc.*, 275 F.3d 762, 766 (9th Cir. 2001) ("In a § 7 case, the relevant market must

14  be defined in order to evaluate the competitive consequences of an alleged restraint of trade.").

15      Defendants suggest that the product market should not be limited to newspapers.  They contend

16  that non-print news sources, such as the Internet and television, compete with newspapers and must be

17  considered when determining if a newspaper acquisition will have anticompetitive effects. This dispute

18  raises a host of complicated issues, which the Court will not decide on the limited record before it.  For

19  purposes of this motion, the Court will restrict the relevant product market to the market for daily

20  newspapers.

21      Because of the unique characteristics of the newspaper industry, defining a newspaper's

22  geographic market is not a simple task.  In Reilly's previous case, the court commented on this difficulty:

23  "An industry exhibiting the characteristics of monopolistic competition . . . does not lend itself well to

24  traditional antitrust analysis, with its considerations of concentration of power in well-defined product

25  and geographic markets."  *Reilly*, 107 F. Supp. 2d at 1201.  Seizing on this difficulty, defendants

26  promote the tautological argument that the relevant geographic markets for the papers they own are the

27  geographic areas that those papers serve.  Thus, defendants would have the Court parse the Bay Area

28  into a number of distinct regions, each of which is covered by a local newspaper monopoly.  For

United States District Court

For the Northern District of California

example, McClatchy argues that San Francisco County is not part of the relevant market for either the *San Jose Mercury News* or the *Contra Costa Times* because both competitors have an extremely limited circulation in San Francisco: the former reaches only 1.04% of San Francisco households (3410 copies), and the latter reaches a paltry 0.04% (143 copies). Under this logic, the Court need not examine the effects of the newspaper sales on San Francisco County residents, because neither of the papers that is to be acquired has any "footprint" in San Francisco.

MediaNews has taken McClatchy's argument and expanded it to all its newspaper holdings in the Bay Area. The end result, according to MediaNews, is a series of local newspaper monopolies with very little overlap in circulation.[5] MediaNews has provided a report of the circulation of its newspapers and the two it seeks to acquire on a zip code-by-zip code basis. This report concludes that in only six zip codes do MediaNews' newspapers overlap in any "significant and comparable" way with the *Contra Costa Times*, while in only three zip codes do its newspapers overlap with the *San Jose Mercury News*. *See, e.g.*, Cascone Decl., Table A; Joskow Decl., ¶¶ 15-16.

Of course, the study is not without its faults. "Significant" overlap is defined to exist in those zip codes in which both the MediaNews newspaper and the McClatchy newspaper have a greater than 10% projected household penetration rate. And "comparable" removes from the study those zip codes in which either newspaper's household penetration rate doubles the other's. Thus, a number of Fremont zip codes do not appear on the list, despite the fact that the *San Jose Mercury News* has a household penetration rate of 10% in the zip code, because *The Argus* has a penetration rate of 30% in that zip code – three times higher than the *San Jose Mercury News*. Further, other documents submitted by defendants suggest that the study's analysis at the zip code level may lose the forest for the trees. The analysis of competition between the *San Jose Mercury News* and *The Argus*, for example, indicates only limited competition between the two papers, but an information sheet describing the Fremont market suggests that the competition may be much more robust. *See* Wedgeworth Decl., Exh. 1. A chart on

[5]In his reply brief, plaintiff characterizes this argument as follows: "Defendants go to great lengths to try to demonstrate that none of the papers at issue in this case competes with any of the others through overlapping circulation or in the sale of advertising. Hence, according to defendants, since there is no existing competition among them, the transactions challenged by plaintiff, under which all of these competing newspapers will eventually be combined under common ownership, can have no adverse effect on competition, which has never existed in the first place." Pl. Reply Br. at 1.

**United States District Court**

**For the Northern District of California**

the sheet depicts "newspaper readership in the Argus market," and shows *The Argus* with 81,400 readers, the *San Jose Mercury News* with approximately 50,000 readers, and *The San Francisco Chronicle* with just over 30,000 readers. Thus, it appears that the *San Jose Mercury News* may actually be a significant competitor of *The Argus*. A somewhat similar level of competition is revealed by a like chart describing the *Times-Herald* market, centered around Vallejo. Wedgeworth Decl., Exh. 2. That chart states that the daily circulation of the *Times-Herald* is 64,700, while the *Contra Costa Times* newspapers have a circulation of 24,300.

In addition to their study, defendants also point to the fact that the MediaNews transaction was fully disclosed to the Department of Justice under the Hart-Scott-Rodino Improvements Act, 15 U.S.C. § 18a. The Antitrust Division investigated the matter, and made a formal request for further information about the MediaNews transaction, extending the 30-day waiting period for that transaction. Despite the fact that the Antitrust Division has indicated that it has received all the information it needs about the transaction, it has not yet taken any action. This is in contrast to McClatchy's acquisition of the *Pioneer Press* in the KRI transaction. The Antitrust Division required McClatchy to divest itself of the *Pioneer Press* to prevent both newspapers in the Twin Cities market from being under common ownership.

This evidence is sufficient to convince the Court that in large part MediaNews' acquisition of the *San Jose Mercury News* and the *Contra Costa Times* will have minimal anticompetitive effects in the Bay Area as a whole. While both papers have a significant circulation, neither has become a true regional paper covering the entire Bay Area. Indeed, in the majority of the Bay Area, it appears that neither paper has a significant presence.

This is not to say, however, that the Court finds the MediaNews transaction untroubling. From the documents defendants have submitted, it appears that the *San Jose Mercury News* is a major competitor with *The Argus*, a MediaNews possessio`n, while the *Contra Costa Times* competes with a number of papers in the East Bay, including the *Times-Herald*, the *Tri-Valley Herald*, *The Oakland Tribune*, and *The Daily Review*, all of which are also owned by MediaNews. Thus, in pockets of the Bay Area MediaNews' acquisition of the two papers may have the effect of reducing competition. In addition, in the Court's understanding, the MediaNews transaction will have the effect of consolidating every major Bay Area newspaper, save *The San Francisco Chronicle*, under the control of CNP and

13

MediaNews.  While *The San Francisco Chronicle* is obviously a major newspaper, the MediaNews transaction will reduce competition for those consumers who seek an alternative or a supplemental news source.  These observations are made all the more troubling by the court's comments about the *San Jose Mercury News* in the previous antitrust case Reilly brought:

> Perhaps most significantly, with the growth in population and striking economic vitality of Santa Clara county, the San Jose Mercury-News poses a serious challenge to the market share of the San Francisco-based metropolitan dailies. The Mercury-News is a comprehensive widely circulated newspaper of high quality. Its inroads in the core circulation areas of the Chronicle and Examiner along the San Francisco peninsula and in southern Alameda county have been significant.  From its base in Santa Clara county, the Mercury-News rivals the Examiner's share of field in Alameda and San Mateo counties and substantially exceeds the shares of field of the Chronicle and Examiner in Santa Clara county. The Mercury-News has recently stepped up its efforts to compete in San Francisco. *See* Steve Rubenstein, *Mercury News' New Edition Hits Stands in 'Frisco'*, San Francisco Chronicle A18 (July 26, 2000).

> The robust competition between the San Francisco dailies and the Mercury-News provides the best example of the market shift that has occurred since the inception of the JOA. In 1965, the geographic center of business activity in the San Francisco Bay area was San Francisco, and newspapers in outlying counties posed no significant threat to Hearst/CPC dominance. Since that year, population and economic growth outside San Francisco has been prodigious relative to that of San Francisco, upending the San Francisco-centric market paradigm.

*Reilly*, 107 F. Supp. 2d at 1200-01.

Based on the foregoing, the Court finds that, while Reilly has not demonstrated a likelihood of success on the merits, he has raised serious questions about the appropriateness of the MediaNews transaction.

### C.    Hardship to Defendants

In opposition to Reilly's motion, defendants argue that they will incur substantial harm if the MediaNews transaction, and thus the Hearst transaction as well, is not allowed to go forward. MediaNews argues that the terms of the loan it is taking out to finance the acquisition may change, resulting in a possible increase in fees and costs of $21 million.  McClatchy, as well, argues that every day that the MediaNews and Hearst acquisitions are delayed results in a $163,000 interest payment on the $1 billion in loans that it will pay off using the proceeds from the transactions.

In addition, defendants raise three non-pecuniary harms that will result if the transactions are enjoined. First, they point out that several union contracts at the *San Jose Mercury News* have expired.

14

Thus, McClatchy is in the awkward position of being obligated to negotiate with the union for a new contract while having little interest in the final outcome of the negotiations. In addition, defendants argue that the uncertainty in the future of the newspapers at issue is distracting their employees and may cause many to leave. Finally, McClatchy argues that it is required to divest itself of the *Pioneer Press*. Thus, any delay in the Hearst transaction may impede McClatchy's ability to live up to its agreement with the Justice Department.

While the Court agrees that the financial amounts at stake are significant – although they constitute only a small portion of the $1 billion value of the transactions at issue – the Court does not find that the non-pecuniary harms are particularly significant. Because the newspapers themselves are not going to be extinguished, the Court is skeptical of defendants' claims that the newspapers at issue risk losing employees because of uncertainty. Further, to the extent a temporary restraining order would prevent McClatchy from living up to its agreement with the Justice Department, that result stems directly from McClatchy's decision to condition the sale of the *Pioneer Press* on the sale of two Bay Area newspapers.

### D.    Balance of Factors

In light of the foregoing, the Court finds that a temporary restraining order would be inappropriate in this case. The irreparable harm that Reilly alleges is neither immediate nor irreversible, and, while he has demonstrated that the MediaNews transaction must be carefully looked over, he has not demonstrated that he is likely to succeed on the merits. Accordingly, the Court DENIES plaintiff's application for a temporary restraining order enjoining the MediaNews transaction.

*///*

**CONCLUSION**

15

1    For the foregoing reasons and for good cause shown, the Court hereby DENIES plaintiff's

2    application for a temporary restraining order (Docket No. 3).

3    **IT IS SO ORDERED.**

4

5    Dated: July 28, 2006

                                                     _____

6                                                    SUSAN ILLSTON
                                                     United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**

For the Northern District of California