IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLINTON REILLY,<br><br>　　　　　Plaintiff,<br>　　v.<br><br>MEDIANEWS GROUP INC, et al.,<br><br>　　　　　Defendants.　　　　／ | No. C 06-04332 SI<br><br>**ORDER RE: SECOND APPLICATION FOR TEMPORARY RESTRAINING ORDER** |

On July 24, 2006, plaintiff Clinton Reilly filed an application for a temporary restraining order, seeking an emergency order blocking the sale of the four Bay Area newspapers, claiming that the sale would result in the lessening of newspaper quality and choice for Bay Area residents. He filed the application a week before the billion-dollar sale was scheduled to close. The Court concluded that plaintiff had not established the urgent need for Court intervention that a temporary restraining order requires, and accordingly denied plaintiff's application. The parties subsequently stipulated to an expedited case management schedule, culminating in a trial scheduled for February 27, 2006. The parties later altered the schedule, pushing trial back to April 30, 2007. Plaintiff now renews his application for temporary restraining order in light of newfound evidence and events occurring since denial of the first application.

**BACKGROUND**

This antitrust case concerns the ownership and control of daily newspapers in the greater San Francisco Bay Area, currently defined by the parties as encompassing San Francisco, Alameda, Contra Costa, Marin, San Mateo, Santa Clara, and Solano counties. By this action, plaintiff Clinton Reilly seeks to block and undo a series of transactions through which, he claims, the past and present owners of the

major Bay Area newspapers have begun to consolidate ownership of those newspapers, to divide up the geographic markets, and ultimately to forego competing with each other.

Defendant The Hearst Company ("Hearst") is a New York company that owns and operates twelve daily newspapers, including *The San Francisco Chronicle,* its sole California newspaper. *The San Francisco Chronicle* is by far the largest newspaper in the Bay Area; according to its website, it has a daily circulation of over 512,000.[1] The majority of this circulation – approximately 400,000 copies – is distributed outside San Francisco County. *See* Prior McClatchy Oppo. Br. at 3 (stating that *The San Francisco Chronicle* has circulation of 114,000 copies inside San Francisco County).

Defendant MediaNews Group, Inc. ("MediaNews") is a privately owned company that owns and operates approximately forty daily newspapers in different areas of the country, including California. MediaNews holds a 54.23% interest in defendant California Newspapers Partnership ("CNP"), a partnership that owns and operates newspapers throughout California. Prior to the events leading to this action, CNP owned and operated eight major Bay-Area newspapers: *The Oakland Tribune* (and its *Alameda Times-Star* edition), which primarily serves northern Alameda County; *The Argus*, centered in the southern Alameda County city of Fremont; *The Daily Review*, circulated in Hayward and surrounding communities in central Alameda County; the *San Mateo County Times* in San Mateo County; the *Tri-Valley Herald* (and its *San Ramon Valley Herald* edition), which serves eastern Alameda County and southern Contra Costa County; the *Marin Independent Journal* in Marin County; the *Times-Herald*, based in Vallejo in southern Solano County; and the *Reporter*, which serves Vacaville and northeastern Solano county. *See* Prior Wedgeworth Decl., Exh. 2 & ¶ 3. Altogether, these newspapers have a circulation of approximately 300,000 daily copies.[2]

The other stakeholders in CNP are defendants Gannett Co. Inc. ("Gannett") and Stephens Group, Inc. ("Stephens"). Gannett publishes approximately ninety daily newspapers, including several California newspapers and *USA Today*. Stephens is a privately held investment banking firm located in Arkansas. It holds interest in a variety of businesses, including newspapers. Stephens owns a 26.28%

---

[1]*See* http://www.sfchron.com/about/index.php.

[2]*See* http://medianewsgroup.com/aboutus/circulationPrint.htm.

2

share of CNP, and Gannett holds the remaining 19.49%.

Finally, defendant-intervenor The McClatchy Company ("McClatchy") is a newspaper publisher based in Sacramento, California. Until recently McClatchy owned and operated 12 daily and 17 non-daily newspapers, including *The Sacramento Bee*, *The Fresno Bee*, *The Modesto Bee*, and the *Star-Tribune* of Minneapolis. While not named as a defendant in Reilly's complaint, it is McClatchy's sale of four newspapers to MediaNews and Hearst that is the genesis of this lawsuit.

On March 13, 2006, McClatchy issued a press release announcing that it had entered into a definitive agreement to acquire Knight Ridder, Inc., a major national newspaper publisher. Through the transaction, McClatchy would gain control of Knight Ridder's 32 daily newspapers and 50 non-dailies, making McClatchy the second-largest newspaper company in the country. The transaction closed on June 27, 2006. McClatchy's acquisition included two Bay Area newspapers: the *Contra Costa Times*, a paper with four daily editions based in Contra Costa County, which has a total daily circulation of 183,000; and the *San Jose Mercury News*, a newspaper based in Santa Clara County with a daily circulation of 276,000.[3] McClatchy also acquired the *Monterey Herald* and the St. Paul *Pioneer Press* in the transaction.

The transaction valued Knight Ridder at approximately $6.5 billion; McClatchy borrowed approximately $3.08 billion to finance the acquisition and pay related transaction costs. Prior Talamantes Decl., ¶ 4. To reduce this debt, McClatchy planned to sell twelve of the Knight Ridder newspapers. Given that McClatchy owned the Minneapolis *Star Tribune*, the *Pioneer Press* was an instant candidate; the Justice Department would not allow McClatchy to operate both newspapers.[4]

---

[3] *See* http://www.contracostatimes.com/mld/cctimes/contact_us/about/; and http://www.mercurynews.com/mld/mercurynews/contact_us/about/.

[4] On June 27, 2006, the Justice Department filed a complaint in the District of Columbia seeking to block McClatchy's acquisition of Knight Ridder, and McClatchy's resulting ownership of both local daily newspapers in the Minneapolis/St. Paul metropolitan area. *See United States v. The McClatchy Co., et al.*, 06-01175 (D.D.C. June 27, 2006). The complaint alleged that the acquisition would substantially lessen competition and tend to create a monopoly in the publishing and distribution of newspapers in violation of Section 7 of the Clayton Act. The complaint defined the relevant product markets as the sale of local daily newspapers to readers and the sale of access to those readers to advertisers in those newspapers. At the same time, the Justice Department filed a proposed consent decree allowing the transaction to proceed provided McClatchy divested itself of the *Pioneer Press*.

McClatchy also decided to sell its California acquisitions: the *Contra Costa Times*, *San Jose Mercury News*, and *Monterey Herald*. All told, the sale of the twelve Knight Ridder newspapers was to generate approximately $2 billion in revenue.

On April 26, 2006, McClatchy and defendants Hearst and MediaNews announced a series of transactions through which McClatchy would divest itself of the four newspapers named above. Although the transactions were complicated, the end result was fairly simple: MediaNews would eventually acquire all four newspapers. In the proposed transactions, McClatchy would sell the *San Jose Mercury News* and the *Contra Costa Times* directly to MediaNews for $736.8 million. McClatchy would also sell the *Monterey Herald* and *Pioneer Press* to Hearst for $263.2 million. Hearst and MediaNews negotiated a separate agreement in which Hearst would transfer the two papers it acquired from Knight Ridder to MediaNews; and MediaNews would operate those papers until the terms of the transfer were finalized. In the preferred method of transfer, Hearst would acquire an interest in MediaNews in exchange for the transfer, specifically an equity investment in MediaNews' operations that did not include any economic interest or governance rights in MediaNews' Bay Area publications.[5] Because Hearst's investment in MediaNews would be subject to scrutiny by the Justice Department, however, the companies did not finalize the exact parameters of the investment. As an alternative method of transfer, in case Hearst and MediaNews were unable to agree on the terms of the investment, MediaNews agreed to purchase the two newspapers directly from Hearst. Thus, regardless of whether Hearst was able to invest in MediaNews, the effect of the April 26, 2006, agreements was that all four McClatchy papers would eventually end up in MediaNews' hands. Finally, because these transactions were all interrelated, the McClatchy sales transactions were conditioned upon each other. That is, both Hearst's and MediaNews' acquisition of the McClatchy papers had to be completed at the same time or not at all.

Once MediaNews acquired the *Contra Costa Times* and the *San Jose Mercury News*, the papers would be transferred to CNP, with both Stephens and Gannett contributing their proportionate share to

---

[5] Although Hearst's proposed interest in MediaNews does not include MediaNews' Bay Area publications, Hearst implies in its filings that it will seek permission at a future time to convert its interest in MediaNews into MediaNews common stock.

4

the purchase price of the two newspapers. In addition, once MediaNews acquired the *Monterey Herald*, that paper would be owned and operated by a newly formed partnership owned 67.36% by MediaNews and 32.64% by Stephens. Again, Stephens would contribute its share of the purchase price of the *Monterey Herald*.

On July 14, 2006, plaintiff Clinton Reilly filed this suit, seeking to enjoin the defendants from consummating these transactions. According to plaintiff, if the transactions are completed, it "will result in the defendants' control of every major newspaper in the Greater Bay Area." Compl. at ¶ 23. Specifically, if the transactions are allowed to go through, it appears that every major Bay Area newspaper will be owned and operated by CNP, with the exception of *The San Francisco Chronicle*. *Compare* Compl. at ¶ 22 (listing major Bay Area newspapers by county), *with* Prior Wedgeworth Decl., Exh. 2 (listing CNP-owned newspapers).

Reilly contends that these agreements are part of a larger conspiracy between The Hearst Company, MediaNews, CNP, Gannett, and Stephens to divide the Bay Area into discrete regions, each of which is covered by a single newspaper monopoly. Further, Reilly contends that once the Bay Area has been divided in this manner, the parties will honor a preexisting agreement not to compete with each other. He alleges that this conspiracy and its underlying transactions violate three antitrust laws: Section 7 of the Clayton Act, 15 U.S.C. § 18; Section 1 of the Sherman Act, 15 U.S.C. § 1; and Section 2 of the Sherman Act, 15 U.S.C. § 2.

On July 24, 2006, Reilly filed an application for a temporary restraining order, seeking an emergency order blocking McClatchy's sale of the four Bay Area newspapers, claiming that the sale would result in the lessening of newspaper quality and choice for Bay Area residents. He filed this application a week before the billion-dollar sale was scheduled to close. The Court concluded that plaintiff had not established the urgent need for Court intervention that a temporary restraining order requires, and accordingly denied plaintiff's application. The sale went through as planned: MediaNews purchased the *San Jose Mercury News* and *Contra Costa Times* directly from McClatchy, with help from Stephens and Gannett; Hearst purchased the *Monterey Herald* and *St. Paul Pioneer Press*, then transferred them to MediaNews, in exchange for a thirty percent stake in all MediaNews-owned newspapers outside of the Bay Area.

5

Plaintiff now renews his application for temporary restraining order in light of newfound evidence and events occurring since denial of the first application.

## LEGAL STANDARD

Temporary restraining orders are governed by the same standard applicable to preliminary injunctions. *See Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs., Inc.*, 181 F. Supp. 2d 1111, 1126 (E.D. Cal. 2001) ("The standard for issuing a preliminary injunction is the same as the standard for issuing a temporary restraining order."). A plaintiff can demonstrate it is entitled to such preliminary relief in either of two ways. Under the "traditional criteria," a plaintiff must show: "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1158 (9th Cir. 2006). Alternatively, a plaintiff may establish "*either* a combination of probable success on the merits and the possibility of irreparable harm *or* that serious questions are raised and the balance of hardships tips sharply in his favor." *Id.* (emphasis in original). These two formulations of the alternate test "represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *LGS Architects, Inc. v. Concordia Homes of Nev.*, 434 F.3d 1150, 1155 (9th Cir. 2006).

## DISCUSSION

Plaintiff casts this lawsuit as an attempt to stop an overarching conspiracy to monopolize the Bay Area's newspaper markets which would cause irreparable injury to competition. The anti-competitive effects have two interrelated origins, according to plaintiff: (1) the reduction from three Bay Area newspaper owners (Knight Ridder, MediaNews/CNP, and Hearst), to two (MediaNews/CNP and Hearst); and (2) illegal collusion between those two remaining owners.

In its prior Order, the Court declined to grant any interim relief based on the second concern. The Court found that the only evidence plaintiff presented of a conspiracy between MediaNews and Hearst was that Hearst was "willing to help finance an acquisition that will only make its competitor

6

stronger." Order at 6:22-23. The Court did not discount the suspicious nature of this financing agreement, but found instead that "[g]iven that the structure of the investment is wholly unknown, the Court believes that the investment is too speculative to be considered in the instant analysis." *Id.* at 7:7-8. The Court also noted: "If Reilly had proof that such a conspiracy existed, the Court's analysis would obviously be different." *Id.* at 7:10-11. Absent evidence of conspiracy, the Court focused only on whether the sale of the *San Jose Mercury News* and the *Contra Costa Times* to MediaNews/CNP, taken in isolation, raised any immediate antitrust concerns.

Plaintiff bases his renewed application for a temporary restraining order on two circumstances. First, plaintiff has uncovered a "secret" letter agreement, dated April 26, 2006, which according to plaintiff is concrete evidence of a price-fixing conspiracy between Hearst and MediaNews. This new evidence, according to plaintiff, mandates re-analysis of the transactions. Second, according to plaintiff, "the defendants have begun to consolidate, commingle, and irrevocably alter the operations of their [MediaNews] Bay Area newspapers," at a pace, and to a degree, not anticipated by the Court at the time of the prior Order. Mot. at 1:21-22. Plaintiff argues that this circumstance should alter the Court's findings with respect to the immediacy and irreparability of the potential harm.

### 1. The April 26 letter

The "secret" April 26, 2006 letter, upon which plaintiff bases half of his argument, is from Hearst Corporation Senior Vice President James Asher, and is addressed to Joseph J. ("Jody") Lodovic, IV, President of MediaNews. The letter states, in pertinent part:

> The Hearst Corporation ("Hearst") and MediaNews Group, Inc. ("MediaNews") agree that they shall negotiate in good faith agreements to offer national advertising and internet advertising sales for their San Francisco Bay area newspapers on a joint basis, and to consolidate the San Francisco Bay area distribution networks of such newspapers, all on mutually satisfactory terms and conditions, and in each case subject to any limitations required to ensure compliance with applicable law.[6]
>
> In addition, Hearst and MediaNews agree that, with respect to the newspapers owned by

---

[6] At oral argument, defense counsel suggested that the anticipated agreements may also include joint production, such as joint or shared printing. Joint production was not, however, mentioned specifically in the April 26 letter.

7

each of them on the date of this letter, they shall work together in good faith to become affiliated with the networks operated by Career Builder LLC ("Career Builder") and Classified Ventures, LLC ("Classified Ventures") on the same terms, and each of Hearst and MediaNews further agrees that neither of them shall enter into any agreement, arrangement or understanding to participate in Career Builder or Classified Ventures or their respective networks with respect to such newspapers unless the other party is offered the opportunity to participate on identical terms. If the parties are unable to enter into arrangements with Career Builder and Classified Ventures, they agree to cooperate with each other in exploring other alliances for internet classified advertising. Any arrangements with respect to Career Builder, Classified Ventures or such other alliances shall be on mutually satisfactory terms and conditions and subject to any limitations required to ensure compliance with applicable law.

. . . .

Kindly sign this letter agreement in the space indicated to evidence your agreement with the foregoing.

Shulman Decl., Ex. 1. The letter is signed by both Asher (Hearst) and Lodovic (MediaNews). *See id.*

The April 26 letter casts serious doubt on several key findings underlying the Court's prior Order. First, the Court accepted defendants' representations that Hearst's involvement in the transactions was solely that of a passive equity investor. Though defendants offered no explanation why Hearst was willing to help finance an acquisition that would only make its competition stronger, the Court did not understand that Hearst expected, or would later receive, any *quid pro quo*. *See* Order at 6-7. However, the April 26 letter suggests, at the very least, that Hearst's investment was specifically tied to an agreement by MediaNews to limit its competition with Hearst in certain ways. This link between Hearst's investment and the agreement to cooperate is further evidenced by a separate letter, dated March 28, 2006, from Asher to Lodovic. The letter states, in pertinent part:

This letter is intended to elaborate on certain terms and conditions of its Investment and the Acquisition Agreement that Hearst will require in order to proceed with the transaction.
. . . .

2. Hearst and MediaNews will enter into agreements to offer national advertising and internet advertising sales for their Bay Area newspapers on a joint basis, and to consolidate the Bay Area distribution networks of such newspapers, all on mutually satisfactory terms and conditions, and in each case subject to any limitation required to ensure compliance with applicable law.

Shulman Decl., Ex. 3. This letter strongly indicates that the cooperation outlined in the April 26, 2006 letter was, in fact, *quid pro quo* for Hearst's assistance to MediaNews in acquiring two of the Bay Area

8

papers.[7]

Accordingly, the April 26 letter casts doubt on the Court's earlier finding that "*The San Francisco Chronicle* is a strong source of competition for CNP's newspapers, even after the MediaNews acquisition is finalized." Order at 10:14-15. The principal source of revenue for newspapers is advertising. The principal costs presumably include distribution and printing. The April 26 letter suggests, at the very least, an intent to limit some aspects of competition between Hearst and MediaNews in advertising and distribution. As such, the letter indicates that the *Chronicle* may not continue to be a "strong source of competition" for the other Bay Area papers. Had it been disclosed to the Court, the April 26 letter would have affected the Court's analysis of the McClatchy-MediaNews-Hearst transactions at issue in this case.

In opposition to plaintiff's renewed application, and at oral argument, defendants make two principal arguments with respect to the cooperation contemplated in the letter: (A) none of the conduct contemplated by the letter has taken place; and (B) the conduct would not be illegal.

A preliminary injunction requires a showing of "*significant threat* of irreparable injury." *Simula, Inc. v. Autoliv, Inc.* 175 F.3d 716, 725 (9th Cir. 1999) (emphasis added). Defendants argue that because the letter constituted only an agreement to "negotiate in good faith" to form certain agreements, and no progress has been made towards forming such agreements, there is no significant threat of irreparable injury. *See* Lodovic Decl. ¶ 10 ("No discussions on joint advertising, distribution, or production operations (other than [discussions related to the Yahoo! deal]) have taken place since the date of that letter."). The Court is unconvinced. First, the fact that defendants' briefs describe, in great detail, the nature of the agreements contemplated by the April 26 letter shows that the parties have engaged in more than just an abstract agreement to negotiate at some later date. Second, the Yahoo! internet advertising deal announced recently suggests that Hearst and MediaNews have made significant progress towards

---

[7]The arrangements contemplated by – indeed, required by – these letters appear inconsistent with the notion that Hearst will have no "information rights in respect of MNG's Bay Area newspapers"; that "firewalls" will prevent Hearst from even the "opportunity to participate in the alleged 'Bay Area newspaper trust'"; and that Hearst "is specifically not going to be involved in MNG's Bay Area newspaper properties." Each of these assertions was made, some more than once, in Hearst's papers opposing the initial motion for temporary restraining order.

9

cooperative deals somewhat similar to those discussed in the letter. Finally, MediaNews and Hearst have stopped short of stating that they have no plans in the immediate future to engage in cooperative agreements of the type described in the letter. The April 26 letter thus evidences a significant threat.

Defendants also argue that none of the conduct contemplated by the letter would be illegal, even if engaged in. Again, the Court is unconvinced. The first arrangement contemplated by the letter is a "good faith agreement[] to offer national advertising . . . sales for their San Francisco Bay area newspapers on a joint basis." *See* Shulman Decl., Ex. 1. Defendants argue that this part of the letter merely reflects an interest in creating "an additional advertising option that some national advertisers might find attractive, which through one 'buy' would cause the publication of an advertisement in all of the parties' Bay Area newspapers." Mot. at 3:28-4:2 (citing Asher Decl. ¶¶ 6-7). Such a "Bay Area buy," defendants contend, would be fully legal. *See* Huseny Decl., Ex. 1 (U.S. Department of Justice, Antitrust Division, Business Review Letter to The Newspaper Association of America, 1993 DOJBRL Lexis 26 (Dec. 10, 1993)). While defendants are now very specific in describing the nature of such an arrangement, the April 26 letter is not so specific. There are other arrangements, which also could be described as an "agreement to offer national advertising sales for their San Francisco Bay area newspapers on a joint basis," which would run afoul of the law.

Furthermore, the Court is not wholly convinced that the arrangement now described by defendants would in fact be legal. For example, if the "Bay Area buy" option becomes the only option available for national advertisers wishing to advertise in any Bay Area newspapers, the agreement might well be *per se* illegal. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940). The National Newspaper Network ("NNN"), cited by defendants as an example of the type of legal arrangement Hearst and MediaNews contemplate forming, appears to be materially distinct from an agreement between the only two local competitors to jointly market advertising space. The NNN involved a large number of newspapers and newspaper companies from around the country. *See* Gaier Decl. ¶ 5(d). Defendants' proposed network would involve just the two remaining competitors in one geographic market. As such, in contrast to the NNN, defendants' proposed network would raise a significant risk of price manipulation. According to the DOJ, "NNN appears to be structured so as to safeguard against unnecessary coordination by competing newspapers by restricting rate information to the executive sales

10

1 director who is required to keep each member's rate floors confidential." Department of Justice, Antitrust Division, *Business Review Letter: The Newspaper Association of America*, 1993 DOJBRL LEXIS 26 (Dec. 10, 1993) (Huseny Decl., Ex. 1) at *7. Such safeguards would be impossible to implement where only two companies are involved. Furthermore, the DOJ's 1993 Business Review Letter regarding the NNN does not definitively establish its legality. Whether an aggregation stifles competition or instead increases it through creation of a new product, is a close and difficult question. The DOJ's conclusion that one manifestation of a national newspaper advertising network is legal does not compel the same conclusion as to an entirely different competitive arrangement.

The April 26, 2006 letter also contemplates an agreement "to consolidate the San Francisco Bay area distribution networks of such newspapers." Shulman Decl., Ex. 1. According to defendants, this phrase merely describes "the possibility of utilizing a common fleet of trucks and delivery personnel to distribute the parties' newspapers and niche publications to households, retail establishments, and coin operated rack outlets." Hearst Opp. at 6:5-7. Again, the letter is not nearly as specific as what defendants now claim was its true plan. Furthermore, the Court is not convinced that an agreement between the only two competitors in a market, to share distribution networks, does not raise serious competitive questions. Defendants argue that because consumers and advertisers do not make spending decisions based on how newspapers are delivered, there is no harm in sharing distribution networks. According to this logic, no collusion which lowers costs between competitors would be illegal. However, increased efficiencies do not necessarily justify otherwise anti-competitive behavior. Collusion between competitors that cuts their costs also may raise barriers to entry by other competitors. The Court therefore cannot conclude that an agreement to share distribution networks will necessarily be pro-competitive.

The fact that the imprecise arrangements pledged in the April 26 letter raise so many questions concerning their competitive impact and propriety lays to rest defendants' final contention – i.e., that the April 26 agreement cannot be illegal because it specifically provided that it was "subject to any limitations required to ensure compliance with applicable law." Defendants' view of "compliance with applicable law," at least as articulated in the current round of pleadings, differs starkly from plaintiff's

11

view and convinces the Court that serious questions have been raised.[8]

The agreements contemplated by the April 26 letter that are ultimately consummated by defendants may or may not be legal. Regardless, such agreements would alter the Court's analysis of this case as a whole. Such agreements, the mere existence of the letter, and the cooperation between Hearst and MediaNews they reflect, increase the likelihood that the transactions at issue here were anti-competitive, and illegal. Further, as defendants asserted repeatedly, the agreements have neither been finalized nor implemented at this point, such that restraining their implementation would amount only to delay. For these reasons, the Court GRANTS plaintiff's request for a temporary restraining order in part. Defendants are temporarily restrained and enjoined from entering into any agreements of the nature described in the April 26 letter, including agreements to offer national advertising sales for their San Francisco Bay area newspapers on a joint basis, and consolidation of the Bay Area distribution networks for their papers.[9]

### 2. Consolidation of MediaNews' Bay Area operations

Plaintiff's second basis for the requested relief is that the rapid and unforseen consolidation of MediaNews' Bay Area operations in recent months has undercut several other key presumptions underlying the Court's previous order.

On October 21, 2006, CNP announced a layoff of 101 *San Jose Mercury News* employees, representing 8.5 percent of its work force. *See* Shulman Decl., Ex. 6. On November 3, 2006, CNP announced a consolidation of operations for several of its Bay Area newspapers, including *The Contra Costa Times*, *The San Jose Mercury News*, and *The Oakland Tribune*. *See* Shulman Decl., Ex. 7. The consolidated operations "are expected to include finance, information technology, marketing, online and part of the advertising operation of the organization." *See id.* Also on November 3, the "*Contra Costa Times* management . . . announced plans to sell the Danville office of *The San Ramon Valley Times* and

---

[8] At oral argument, defendants characterized the arrangements as "competitively innocuous or pro-competitive collaboration." Plaintiff characterizes them as *per se* violations of Section 1 of the Sherman Antitrust Act.

[9] This Order does not affect defendants' recently announced deal with Yahoo.

move its staff to Pleasanton." *See* Shulman Decl., Ex. 8. On November 1, The East Bay Express website reported that "John Armstrong, publisher of the *Oakland Tribune*, the *Contra Costa Times*, and several other East Bay newspapers told reporters, photographers, and editors last night to expect layoffs 'in the weeks ahead.'" Shulman Decl., Ex. 9. On November 3, the same website reported on plans "to vacate the storied Tribune Tower in downtown Oakland in the coming months" as "part of a sweeping consolidation plan brought about by the MediaNews . . . purchase of the *Contra Costa Times* and the *San Jose Mercury News*." *Id.*, Ex. 10. A November 10, 2006 e-mail sent by John Armstrong as an "Employee Update," confirmed more layoffs, as well as outsourcing of some advertising production work to India. *See id.*, Ex. 11.

According to plaintiff, these events "are hollowing out these once fine newspapers and scrambling the eggs so that divesture (sic) may no longer be an option." Mot. at 15:7-9. "If this conduct is allowed to continue, then this Court's power to order divestiture, rescission, or any other equitable remedy directed at the acquisition and operation of these newspapers by the defendants may prove to be irremediably impaired and compromised." *Id.* at 1:24-2:1. The Court disagrees. While consolidation of some aspects of the papers may make divestiture more difficult, it will not make it impossible. The *San Jose Mercury News* and the *Contra Costa Times* continue to exist despite recent events, and could be divested. Plaintiff has made no allegation that defendants are diminishing the circulation of these two papers in favor of other MediaNews Bay Area papers. As long as the *Mercury News* and *Contra Costa Times* maintain their share of the Bay Area newspaper market, divestiture will be a feasible and adequate remedy.

The Court therefore DENIES the request to temporarily restrain further consolidation of the operations of the affected newspapers.

**CONCLUSION**

Defendants are TEMPORARILY RESTRAINED AND ENJOINED from entering into any agreements of the nature described in the April 26 letter, including agreements to offer national advertising sales for their San Francisco Bay area newspapers on a joint basis, and consolidation of the Bay Area distribution networks for their papers. Defendants are ORDERED TO SHOW CAUSE on or

before December 6, 2006 at 4:00 p.m. why they should not be similarly preliminarily enjoined pending trial of this action in April 2007. The Court does not anticipate receiving any oral testimony. L.R. 7-6.

**IT IS SO ORDERED.**

Dated: November 28, 2006

                                           SUSAN ILLSTON
                                           United States District Judge