1
2
3
4
5                       IN THE UNITED STATES DISTRICT COURT

6                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    CLINTON REILLY,                              No. C 06-04332 SI

9              Plaintiff,                         **ORDER DENYING DEFENDANTS'**
                                                  **MOTION FOR SUMMARY JUDGMENT**
10      v.                                        **BASED ON PLAINTIFF'S LACK OF**
                                                  **STANDING**
11   MEDIANEWS GROUP, INC, *et al.*,

12             Defendants.
                                          /
13

14          Plaintiff Clinton Reilly brought this antitrust case to block and undo a series of transactions

15   through which, he claims, the past and present owners of the major San Francisco Bay Area newspapers

16   have begun to consolidate ownership of those newspapers, to divide up geographic markets, and

17   ultimately to forego competing with each other.[1]  Pursuant to an expedited case management schedule

18   stipulated to by the parties, trial is currently set for April 30, 2007.

19          On April 6, 2007, the Court heard argument on defendants' motion for summary judgment based

20   on plaintiff's lack of standing.  Defendants argue that because plaintiff is not threatened with any

21   "antitrust injury," he does not have standing to bring this suit.  Having considered the arguments of the

22   parties and the papers submitted, and for good cause shown, the Court DENIES defendants' motion.

23

24                                      **LEGAL STANDARD**

25          Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories,

26   and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any

27   _____

28          [1]The order issued on November 28, 2006 contains a more detailed summary of the relevant facts
     of this case.

material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *T.W. Elec. Service, Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

Defendants argue that plaintiff lacks standing to bring this suit because the actions of which he complains do not threaten him with any antitrust injury. Plaintiff responds that, as a subscriber to the *San Francisco Chronicle* and frequent purchaser of other Bay Area newspapers, he is threatened with antitrust injury because defendants' actions are likely to result in price increases and diminished diversity of content.[2]

## I.      Chief Judge Walker's standing analysis in *Reilly I*

The issue of plaintiff's standing arose in prior case before Chief Judge Walker, *Reilly v. The Hearst Corp.*, 107 F. Supp. 2d 1192 (N.D. Cal. 2000) ("*Reilly I*"). Chief Judge Walker's standing

---

[2]Plaintiff also argues in a footnote that he has standing as an advertiser. As discussed below, this argument fails.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

analysis in *Reilly I* supports a finding of standing in this case.  In *Reilly I* plaintiff alleged that Hearst's

acquisition of the *San Francisco Chronicle* violated sections 1 and 2 of the Sherman Act.  As in this

case, plaintiff brought his claims under section 16 of the Clayton Act.  *Id.* at 1194.  At the time, Hearst

published the *San Francisco Examiner*, which was a major daily and an active competitor to the

*Chronicle*.  *Id.* at 1193-94.

Before proceeding to the merits, Chief Judge Walker analyzed whether plaintiff had standing

to bring his claims "as a subscriber to the Chronicle and single-copy purchaser of the Examiner . . . ."

*Id.* at 1194.  He concluded that Reilly did have standing, stating:

> Plaintiff claims that the challenged transactions would eliminate one of only two
> providers of daily newspaper news, features and opinion in what plaintiff contends is the
> relevant market. . . .  These claims, while novel, would appear to state a cognizable
> injury to plaintiff as a consumer of newspaper news, features and opinion and to
> competition in that market; if proved, such a claim would entitle plaintiff to injunctive
> relief under section 16 of the Clayton Act, 15 U.S.C. § 26.

*Id.* at 1195.  In reaching this conclusion, Chief Judge Walker relied heavily on the congressional intent

regarding newspaper markets reflected in the Newspaper Preservation Act ("NPA"), 15 U.S.C. §§

1801-1804.  He stated:

> Standing analysis in this case is informed, in part, by the [NPA].  The NPA provides an
> antitrust exemption for an otherwise unlawful combination or merger of two
> newspapers' business operations if the market for newspaper circulation and advertising
> does not provide sufficient revenue to support independent publication of the
> newspapers.  In that situation, the NPA permits two newspaper firms to combine their
> business operations as long as they continue to produce separate newspapers.
>
> Although the NPA does not confer affirmative rights on newspaper readers or advertisers
> or competing newspaper firms, the Sherman Act and Clayton Act should be read bearing
> in mind the legislative purposes that prompted enactment of the NPA; namely,
> encouragement of multiple sources of newspaper news, features and opinion.  The NPA
> thus imports distinctly non-economic considerations into the antitrust statutes, which
> otherwise exclusively confine their scope to matters of economic consequence.  Under
> this statutory framework, the elimination of a newspaper represents a cognizable injury
> to interests protected by the antitrust laws, and this injury supplies a ground for standing
> under Article III.

*Id.*

Defendants here argue that Chief Judge Walker's finding of standing is inapplicable because this

case does not involve the NPA.  In *Reilly I*, defendants argue, the NPA was at issue because as part of

the challenged acquisition, the *Chronicle* and the *Examiner* would be terminating a joint operating

agreement ("JOA") that was permitted under the NPA.  According to defendants, in *Reilly I* plaintiff

**United States District Court**
For the Northern District of California

1   "sued to prevent termination of the San Francisco JOA and to ensure the continued existence of the

2   *Examiner*." Reply at 3:1-2. This Court agrees with plaintiff that defendants' argument misinterprets

3   both the nature of *Reilly I*, and Chief Judge Walker's use of the NPA in the *Reilly I* standing analysis.

4         Plaintiff in *Reilly I* sued to maintain the existence of two viable, editorially independent

5   newspaper competitors in the San Francisco market. Whether the competitors existed pursuant to the

6   JOA, or as fully independent papers, was not plaintiff's concern. Moreover, Chief Judge Walker

7   ultimately treated the proposed merger of the JOA competitors as a court would treat the proposed

8   merger of any competitors. He stated: "a transaction terminating a JOA is subject to ordinary antitrust

9   scrutiny." *Id.* at 1203. "The court concludes that in an antitrust challenge to a proposed merger of JOA

10  newspapers, the defendants may avoid liability by proving the traditional failing company defense . .

11  . ." *Id.* The existence of the JOA was thus critical to understanding and analyzing the facts of the case,

12  but it did not alter the Court's analytical antitrust framework. *Reilly I* was not an "NPA case" or a "JOA

13  case"; it was an antitrust case, like this one, dealing with consolidation in a local newspaper market.

14        Similarly, the standing analysis did not depend on the involvement of the NPA in the facts of

15  *Reilly I*, as defendants here suggest. Chief Judge Walker simply noted that the NPA reflects a

16  congressional concern with "encouragement of multiple sources of newspaper news, features and

17  opinion," and "the Sherman Act and Clayton Act should be read bearing in mind [these] legislative

18  purposes." *Id.* at 1195. There is no reason to think that Congress was only concerned with newspaper

19  diversity in situations where the NPA is involved.

20        This Court agrees with the analysis of standing made in *Reilly I*. The NPA evidences that

21  Congress values the existence of separate sources of newspaper content in a community, and that loss

22  of separate sources injures consumers. The existence of the NPA thus strongly suggests that loss of

23  diversity of content is a "threatened loss or damage 'of the type the antitrust laws were designed to

24  prevent and that flows from that which makes defendants' acts unlawful.'" *Cargill, Inc. v. Monfort of

25  Colorado, Inc.*, 479 U.S. 104, 113 (1986). This conclusion is consistent with the Supreme Court's broad

26  interpretation of the Clayton Act, which "does not confine its protection to consumers, or to purchasers,

27  or to competitors, or to sellers. . . . The Act is comprehensive in its terms and coverage, protecting all

28  who are made victims of the forbidden practices by whomever they may be perpetrated." *Blue Shield*

1 *of Virginia v. McCready*, 457 U.S. 465, 472 (1982).

2

United States District Court

For the Northern District of California

3  **II.      General antitrust standing**

4        Even under the traditional antitrust analysis, independent of the newspaper context, plaintiff has

5  standing as a consumer.  Plaintiff brings this case under section 16 of the Clayton Act, 15 U.S.C. § 26,

6  which provides in pertinent part:  "[any] person, firm, corporation, or association shall be entitled to sue

7  for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws.

8  . . ."  15 U.S.C. § 26.  "[I]n order to seek injunctive relief under § 16, a private plaintiff must allege

9  threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from

10  that which makes defendants' acts unlawful.'"  *Cargill*, 479 U.S. at 113 (1986); *see also Glen Holly*

11  *Entm't Inc. v. Tektronix Inc.*, 352 F.3d 367, 371 (9th Cir. 2003) ("Only those who meet the requirements

12  for 'antitrust standing' may pursue a claim under the Clayton Act; and to acquire 'antitrust standing,'

13  a plaintiff must adequately allege and eventually prove 'antitrust injury.'").

14        In the context of a claim under section 4 of the Clayton Act, which, unlike section 16, provides

15  for monetary damages, the Ninth Circuit summarized the antitrust injury requirement as follows:

16        Antitrust injury is made up of four elements:  "(1) unlawful conduct, (2) causing an
        injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and
17        (4) that is of the type the antitrust laws were intended to prevent."

18        In addition, we impose a fifth requirement, that "the injured party be a participant in the
        same market as the alleged malefactors."  "In other words, the party alleging the injury
19        must be either a consumer of the alleged violator's goods or services or a competitor of
        the alleged violator in the restrained market."   In fact, and as the district court
20        recognized, "*Consumers in the market where trade is allegedly restrained are
        presumptively the proper plaintiffs to allege antitrust injury*."
21
22  *Glen Holly*, 352 F.3d at 372 (citations omitted) (emphasis added).

23        "To maintain an antitrust divestiture suit [(section 16)], a private plaintiff must generally meet

24  all the requirements that apply to the damages [(section 4)] plaintiff, except that the injury itself need

25  only be threatened, damage need not be quantified, and occasionally a party too remote for damages

26  might be granted an injunction."  *Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*,

27  140 F.3d 1229, 1234 (9th Cir. 1998); *see also Cargill*, 479 U.S. at 111 ("It is plain that § 16 and § 4 do

28  differ in various ways.  For example, § 4 requires a plaintiff to show actual injury, but § 16 requires a

showing only of 'threatened' loss or damage; similarly, § 4 requires a showing of injury to 'business or property,' while § 16 contains no such limitation.") (citations omitted).  "[U]nder both § 16 and § 4 the plaintiff must still allege an injury of the type the antitrust laws were designed to prevent." *Cargill*, 479 U.S. at 111

"The central purpose of the antitrust laws, state and federal, is to preserve competition.  It is competition . . . that these statutes recognize as vital to the public interest." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000).  "Every precedent in the field makes clear that the interaction of competitive forces . . . is what will benefit consumers." *Id.*  The Sherman Act:

> was enacted in the era of "trusts" and of "combinations" of businesses and of capital organized and directed to control of the market by suppression of competition in the marketing of goods and services, the monopolistic tendency of which had become a matter of public concern.  The end sought was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services, all of which had come to be regarded as a special form of public injury.

*Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493-94 (1940).

> A refusal to compete with respect to the package of services offered to customers, no less than a refusal to compete with respect to the price term of an agreement, impairs the ability of the market to advance social welfare by ensuring the provision of desired goods and services to consumers at a price approximating the marginal cost of providing them.

*FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 459 (1986); *see also Glen Holly*, 352 F.3d at 377 ("Antitrust law addresses distribution restraints in order to protect consumers from the higher prices or diminished choices that can sometimes result from limiting intrabrand competition.") (citation omitted).

In *Lucas Automotive*, 140 F.3d 1229, the Ninth Circuit "decide[d] whether a distributor and downstream purchaser of vintage automobile tires has standing to bring an antitrust action under the Clayton Act against a competitor and supplier for damages and divestiture." *Id.* at 1230.  The district court had dismissed the plaintiff's claims on summary judgment because the plaintiff "has not produced any evidence to show that [defendant] has in fact raised these prices on brand name vintage tires. Therefore, it has not suffered any actual injury." *Id.* at 1235 (quoting case).  The Ninth Circuit reversed the district court, stating:

> We conclude that [plaintiff], . . . as a customer in a market controlled by a monopolist, has standing to assert a § 7 claim for equitable relief, including divestiture, under § 16

6

United States District Court
For the Northern District of California

[of the Clayton Act].  It established a *prima facie* case, both that it was an active participant in the vintage tire market and that [defendant's] conduct in that market violated § 7.  This showing was thus sufficient to avoid summary judgment on [plaintiff's] Clayton Act § 7 claim for equitable relief.

*Id.* at 1237.  In *Lucas*, therefore, it was sufficient that plaintiff was an active consumer in a market in which there was anti-competitive activity; the Ninth Circuit did not require the plaintiff to present evidence of a prior or imminent raise in prices.  Similarly here, plaintiff is an active consumer in the Bay Area newspaper market, in which he alleges there is anti-competitive activity.

Defendants suggest that *Lucas* is distinct because here there is no evidence that "a price increase is virtually inevitable, as was the case in *Lucas Automotive* . . . ."  Reply at 8:25.  Nowhere in *Lucas*, however, did the Ninth Circuit find or suggest that a price increase was "virtually inevitable."  The Ninth Circuit only found that plaintiff had shown "*prima facie*, that [defendant]'s conduct threatens 'substantially to lessen competition' and 'tends to create a monopoly' . . . ."  140 F.3d at 1236.  Here, whether defendants' actions threaten to lessen competition, create a monopoly, or raise prices, is the issue the Court must decide after trial.  Plaintiff alleges anti-competitive acts in the Bay Area newspaper market, and provides evidence that he is an active consumer in that market, *see* Reilly Depo. (Scarborough Decl., Ex. 1) at 47-48, 52-53.  This is sufficient under *Lucas* to defeat summary judgment. *See* 140 F.3d at 1237.

## CONCLUSION

In sum, *Lucas* and *Reilly I*, supported by the purposes underlying the antitrust statutes, compel this Court to find that plaintiff has raised a genuine issue as to whether he has valid antitrust injury in this case.  "Consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury."  *Glen Holly*, 352 F.3d at 372.  Plaintiff here presents evidence that he is "an active participant in the [newspaper] market and" alleges that defendants' "conduct in that market violate[s]" the Sherman Act.[3]  *Lucas*, 140 F.3d at 1237.  This is "sufficient to avoid summary

---

[3]Plaintiff is not, however, an "active participant" in the Bay Area newspaper advertising market. Apart from a handful of advertisements placed in the *Chronicle* by two limited liability companies in which plaintiff is a shareholder, plaintiff has not engaged in any advertising in Bay Area newspapers. A shareholder has no standing to assert a claim based on an injury to a corporation.  *See Shell*

judgment on [plaintiff's] Clayton Act . . . claim for equitable relief." *Id.* For the foregoing reasons and for good cause shown, the Court concludes that plaintiff has standing to assert his Clayton Act claims, and DENIES defendants' motion for summary judgment.

**IT IS SO ORDERED.**

Dated: April 10, 2007

SUSAN ILLSTON
United States District Judge

---

*Petroleum, N.V. v. Graves*, 709 F.2d 593, 595 (9th Cir. 1983).  Furthermore, in deposition plaintiff offered no more than a vague plan "in my head" to do some future advertising in Bay Area newspapers. *See generally* Scarborough Decl., Ex. A (Reilly Dep.) at 180-183.  Plaintiff therefore does not have standing as a consumer of newspaper advertising space.